812 P.2d 977

**ST. PAUL FIRE AND MARINE INSUR-
ANCE COMPANY, Plaintiff–Appellant,
Cross Appellee,**

v.

**Sharon GILMORE and John Doe Gil-
more, wife and husband, Defendants–
Appellees, Cross Appellants.**

No. CV–90–0193–PR.

Supreme Court of Arizona,
En Banc.

May 16, 1991.

Reconsideration Denied July 10, 1991.

William J. Downey, Rake Downey McGovern & Shorall, P.C., and Scott E. Boehm, Copple, Chamberlin & Boehm, P.C., Phoenix, for plaintiff-appellant, cross appellee.

James M. Ackerman, Jennings, Strouss & Salmon, and Harold Feder, Feder Law Offices, P.A., Phoenix, for defendants-appellees, cross appellants.

## OPINION

FELDMAN, Vice Chief Justice.

The court of appeals held that a comprehensive general liability insurance policy, which also provided automobile liability coverage by specific endorsement, was exempt from the requirements of A.R.S. § 20–259.01, the Uninsured Motorist Act. *See St. Paul Fire & Marine Ins. Co. v. Gilmore,* 165 Ariz. 113, 796 P.2d 915 (Ct. App.1990). Because the question is one of first impression in our courts, we granted review. Rule 23, Ariz.R.Civ.App.P., 17B A.R.S. We have jurisdiction under Ariz. Const. art. 6, § 5(3), A.R.S. § 12–120.24.

This is yet another case in which we must address the inter-relationship between the Uniform Motor Vehicle Safety Responsibility Act, A.R.S. § 28–1170 *et seq.*, and the Uninsured Motorist Act, A.R.S. § 20–259.01 *et seq.* In the most general of terms, the former was intended to provide funds to compensate those injured in automobile accidents by requiring certain owners and drivers to purchase insurance, while the latter was intended to provide a source of compensation from the accident victim's own insurance company through the required insertion of uninsured motorist coverage and offer of underinsured motorist coverage in every automobile liability or motor vehicle liability policy sold in Arizona. *See Employers Mut. Cas. Co. v. McKeon,* 159 Ariz. 111, 114, 765 P.2d 513, 516 (1988); *Calvert v. Farmers Ins. Co.,* 144 Ariz. 291, 296, 697 P.2d 684, 689 (1985). Hoping to assist the reader, wherever possible we will refer to the Uniform Motor Vehicle Safety Responsibility Act as the SRA and to the Uninsured Motorist Act as the UMA.

## FACTS AND PROCEDURAL HISTORY

For purposes of this petition for review, the facts are undisputed. Sharon Gilmore was seriously injured in an automobile accident caused by another driver. At the time, Gilmore was driving her own car but acting in the course of her employment as the executive secretary who managed the day-to-day operations of the Arizona Association for Industrial Development (AAID). She recovered $50,000 in liability insurance proceeds from the negligent driver, as well as $50,000 in underinsured motorist (UIM) coverage under her own automobile policy. Having exhausted these policies, she then sought additional UIM coverage from AAID's insurer, St. Paul Fire and Marine Insurance Co. (St. Paul).

At the time of the accident, AAID had a comprehensive general liability policy with St. Paul. The policy provided standard fire insurance, property insurance, and general liability coverage, including bodily injury and property damage, in a combined single-limit amount of $1,000,000. The policy protected AAID and, by endorsement, its employees acting within the scope of their duties. The original wording in the policy form excluded coverage for liability arising from ownership or use of automobiles, but a special endorsement, for which an additional premium was paid, provided "LIABILITY PROTECTION FOR AUTOS YOU DON'T OWN." This four-page endorsement set forth, in more or less standard terms,[1] operator's coverage protecting AAID *and its employees*[2] from liability for accidents involving employees driving their own vehicles on company business, providing "excess insurance for any covered auto" to apply "after primary coverage has been used up." St. Paul issued the endorsement without offering UIM coverage, and none was included in the policy. Gilmore's injuries undisputedly exceed the $100,000 she has thus far received.

St. Paul filed an action seeking a declaration that it had no obligation to provide UIM benefits to Gilmore under the policy issued to AAID. Gilmore argued that St. Paul was obligated to offer UIM coverage by A.R.S. § 20–259.01(C) and that because St. Paul failed to do so, the coverage must be imputed as a matter of law. *See Insurance Co. of N. Am. v. Superior Court*, 166 Ariz. 82, 85, 800 P.2d 585, 588 (1990). On cross-motions for summary judgment, the trial court ruled for Gilmore.

The court of appeals reversed, holding that AAID's insurance with St. Paul was neither an "automobile liability" policy nor a "motor vehicle liability" policy within the meaning of A.R.S. § 20–259.01. *Gilmore*, 165 Ariz. at 119, 796 P.2d at 921. The court held that the two terms used in the UMA were interchangeable and referred only to motor vehicle liability policies issued pursuant to the SRA. *Id.* at 118–19, 796 P.2d at 920–21. The court found that AAID's policy with St. Paul did not conform to the requirements of the SRA and was therefore beyond the purview of the UMA. *Id.* at 119, 796 P.2d at 921. The court also stated that automobile liability insurance provided on an "excess" or "umbrella" basis need not conform to the UMA. *Id.* at 119–20, 796 P.2d at 921–22.

Contending that an important issue of state law has been incorrectly decided, Gilmore petitioned us to review the court of appeals' opinion. We granted review to determine whether a comprehensive general liability insurance policy that by specific endorsement includes automobile liability coverage is an "automobile liability or motor vehicle liability" policy so that the insurer is required by the UMA to offer underinsured coverage.

## DISCUSSION

### A. Umbrella and Excess Coverage

In determining whether automobile liability insurance added by endorsement to a

---

1. Appellant's Opening Brief, Exh. 3, at 44–47. We'll pay damages you and others protected under this agreement are legally required to pay for covered bodily injury or property damage claims caused by an accident resulting from the use of or the loading or unloading of a covered auto.

*Id.*, Exh. 3, at 44.

2. St. Paul conceded for purposes of appeal that Gilmore was an insured under the automobile endorsement of the policy at the time of the accident. *Gilmore*, 165 Ariz. at 114, 796 P.2d at 916.

comprehensive general liability policy must conform to the requirements of the UMA, we deem it important, at the outset, to eliminate a source of confusion that may have plagued both parties and the court of appeals. St. Paul, Gilmore, and the court of appeals discussed in some detail whether underinsured motorist statutes such as A.R.S. § 20–259.01(C) apply to umbrella or excess insurance policies and noted that there is a split of authority among courts considering the issue. *Gilmore,* 165 Ariz. at 120–22, 796 P.2d at 922–24. We find the issue irrelevant because AAID's automobile liability insurance cannot be considered umbrella or true excess coverage, as those terms are properly understood.

■ There are two senses in which insurance may be deemed excess. The first, which is so-called umbrella coverage, applies when the *same insured* has purchased underlying coverage for the *same risk.* This type of true excess (umbrella) policy provides, for a modest premium, coverage against catastrophic losses that exceed the limits of the underlying coverage. 8C J. APPLEMAN, INSURANCE LAW & PRACTICE § 5071.65, at 107 (1981).[3] This excess insurance comes into play only after the limits of the same insured's primary coverage have been exhausted. 16 COUCH ON INSURANCE § 62.48, at 484 (2d ed. 1983). With this type of coverage, the limits of the underlying policy operate as a kind of deductible, and "an insured pays a reduced premium to the excess carrier expressly because that carrier will be obligated to pay a claim only after a certain amount has been paid" by the insured's primary insurer. *Maricopa Coun-*

*ty v. Federal Ins. Co.,* 157 Ariz. 308, 310, 757 P.2d 112, 114 (Ct.App.1988); *Allstate Ins. Co. v. Employers Liab. Assur. Corp.,* 445 F.2d 1278, 1280 (5th Cir.1971) (umbrella policy at issue expressly required same insured to maintain certain other policies of primary insurance); *see also Ryder Truck Lines, Inc. v. Carolina Cas. Ins.,* 372 N.E.2d 504, 511 (Ind.App.1978) (comparing true excess coverage to deductible where amount of deductible is taken into account in reducing premium), *rev'd on other grounds,* 270 Ind. 315, 385 N.E.2d 449 (Ind. 1979).

■ Each of the cases cited by the parties or discussed by the court of appeals involved true excess or umbrella coverage because the same insured had purchased primary underlying coverage for the same risks.[4] These cases are not in point. St. Paul's policy cannot be considered umbrella coverage because AAID neither had nor was required by St. Paul to have an underlying policy covering the same risks.

■ Under facts very similar to the present case, the Wisconsin Supreme Court held that an employer's insurer was "not a true excess carrier, because the policy was not written under circumstances where rates were ascertained after giving due consideration to known existing and underlying basic or primary policies." *Loy v. Bunderson,* 107 Wis.2d 400, 320 N.W.2d 175, 179 (1982). "[T]his is not a situation in which a particular named insured purchased basic coverage and then purchased additional coverage in excess of its primary contract. Here the fact of excess coverage is a mere coincidence." *Id.*

---

**3.** The court of appeals noted the different purpose of umbrella policies and quoted the following statement by Professor Appleman:

Umbrella policies serve an important function in the industry. In this day of uncommon, but possible, enormous verdicts, they pick up this exceptional hazard at a small premium. Assuming one's automobile and homeowner's policies have liability limits of $100,000 or even $500,000, the umbrella policy may pick up at that point and cover for an additional million, five million or ten million. It may assume as a primary carrier certain coverages not included elsewhere, such as invasion of privacy, false arrest, etc., but there is no inten-

tion to supplant the basic carriers on the homeowner's or automobile coverages. Therefore, these should not even enter into our current consideration.

*Gilmore,* 165 Ariz. at 120, 796 P.2d at 922 (quoting 8C J. APPLEMAN, *supra* § 5071.65, at 107). We also agree with Professor Appleman. His comments, however, apply *only* to umbrella, true excess, policies.

**4.** *See, e.g., Trinity Universal Ins. Co. v. Metzger,* 360 So.2d 960 (Ala.1978), and *Southern American Ins. Co. v. Dobson,* 441 So.2d 1185 (La.1983) (on rehearing). *See also Gilmore,* 165 Ariz. at 120–22, 796 P.2d at 922–24.

■ As in *Loy,* AAID's policy with St. Paul is not excess because it provides AAID's only automobile insurance. There is no indication that the premium for St. Paul's automobile liability coverage was calculated on the basis that coverage would come into play only after the minimum, fixed limits of primary coverage were exhausted. *Maricopa County,* 157 Ariz. at 310, 757 P.2d at 114; *Ryder,* 372 N.E.2d at 511; *Loy,* 320 N.W.2d at 179. Indeed, AAID's automobile liability coverage inarguably would have provided primary liability coverage for Gilmore if she had been personally uninsured at the time of the accident. *Cf. United Services Auto. Ass'n v. Empire Fire & Marine Ins. Co.,* 134 Ariz. 64, 66, 653 P.2d 712, 714 (Ct.App. 1982) ("Under no set of circumstances can Empire's coverage ever be primary insurance.").

■ The second sense in which insurance may be termed excess applies when *other* insureds have purchased insurance that fortuitously may be applicable to a given loss. But whether AAID's policy with St. Paul is primary or excess in this sense is not dispositive in the present case because the UMA requires us to determine whether, *at the time it issued its policy* to AAID, St. Paul was required to offer UIM coverage. *See* A.R.S. § 20–259.01. As we have noted elsewhere, this determination cannot be affected by *a priori* considerations of what other insurance may later turn out to be available for a particular accident. *Rashid v. State Farm Mut. Auto. Ins. Co.,* 163 Ariz. 270, 273 n. 3, 787 P.2d 1066, 1069 n. 3 (1990). In short, whether St. Paul was obligated to offer UIM coverage to AAID when it issued the endorsement cannot hinge on fortuitous and unforeseen circumstances and events that literally transpire down the road.

In determining St. Paul's obligations when it offered this automobile liability coverage, it is therefore irrelevant that some other insurance might be available or primary in a particular accident. The whole point of UM and UIM coverage is

that other insurance might *not* be available, or if available, might *not* be adequate to fully compensate for resultant bodily injury. *Brown v. State Farm Mut. Auto. Ins. Co.,* 163 Ariz. 323, 328, 788 P.2d 56, 61 (1989).

We must therefore reject St. Paul's contention that the policy is excess and "only tangentially related to automobile liability." Response to Petition for Review at 6. That the policy does not provide umbrella, or true excess, coverage, however, does not entirely settle the question of whether St. Paul was obligated to offer UIM coverage.[5] To that question we return.

**B. Automobile Liability or Motor Vehicle Liability Policies Under the UMA**

The parties agree that AAID's policy with St. Paul provides automobile liability insurance. Petition for Review at 2, Response at 3. The question is whether the requirements of the UMA can be avoided when such coverage is provided by endorsement to a general comprehensive liability policy.

Under Arizona statutes the UMA applies to any "automobile liability *or motor vehicle liability* policy insuring against loss resulting from liability ... arising out of the ownership, maintenance, or use of a motor vehicle...." A.R.S. § 20–259.01(A), (B), and (C) (emphasis added). A.R.S. § 20–259.01(C) specifically provides, in pertinent part, that every such policy

shall ... make available to the named insured thereunder and shall by written notice offer the insured and at the request of the insured shall include within the policy under-insurance motorist coverage which extends to and covers all persons insured under the policy, in limits not less than the liability limits for bodily injury or death contained within the policy.

(Emphasis added.)

*1. Ambiguity*

■ The court of appeals found the phrase "automobile liability or motor ve-

---

**5.** Because we find the policy in question is not a true excess or umbrella policy, we need not—

and do not—decide whether such policies are exempt from the SRA or UMA.

hicle liability policies" ambiguous and construed the two terms within the phrase to mean the same thing—a motor vehicle policy issued under the SRA, A.R.S. § 28–1170. *Gilmore*, 165 Ariz. at 115, 118, 796 P.2d at 917, 920. Where statutory provisions contain no ambiguity or conflict, resort to doctrines of judicial construction is uncalled for. *McKeon*, 159 Ariz. at 114, 765 P.2d at 516. The language used in a statute should be construed in the sense used and understood by ordinary persons unless technical construction was clearly intended. A.R.S. § 1–213; *Albert Steinfeld & Co. v. Allison Mining Co.*, 41 Ariz. 340, 18 P.2d 267 (1933). Courts should not strain to find ambiguity in the ordinary words of a statute. *Industrial Comm'n v. Price*, 37 Ariz. 245, 292 P. 1099 (1930); *Parise v. Industrial Comm'n*, 16 Ariz.App. 177, 179, 492 P.2d 426, 428 (1971) ("lacking a clear expression of legislative intention, we will not read into the definition of a term something other than the ordinary meaning").

We are hard pressed to find any ambiguity in the case before us. We believe an insurance policy that provides the named insured's only insurance against "bodily injury or property damage ·claims caused by an accident resulting from the use of or the loading or unloading of a covered auto" falls within the statutory scope of an "automobile liability or motor vehicle liability policy insuring against loss resulting from liability imposed by law for bodily injury or death suffered by any person arising out of the ownership, maintenance, or use of a motor vehicle." A.R.S. § 20–259.01(A).

### 2. *Statutory Construction*
#### a. The Type of Policy

St. Paul argues not only that the UMA is ambiguous but that the UMA must be con-

strued *in pari materia* with the SRA and that the UMA applies only to those motor vehicle liability policies defined in and issued pursuant to the SRA. Even if we were to accept St. Paul's first contention, we would have to reject its second and third.

Statutory construction, of course, encompasses more than the doctrine of *in pari materia*.[6] "There is no magic in statutory construction and no legal legerdemain should be used to change the meaning of simple English words...." *Kilpatrick v. Superior Court*, 105 Ariz. 413, 421, 466 P.2d 18, 26 (1970). The cardinal rule is to determine and give effect to the legislative intent behind the statute, considering the "context of the statute, the language used, the subject matter, the historical background, the effects and consequences, and the spirit and purpose of the law." *Martin v. Martin*, 156 Ariz. 452, 457, 752 P.2d 1038, 1043 (1988); *Calvert*, 144 Ariz. at 294, 697 P.2d at 687.

The context of the SRA is important in this case because its definition of "motor vehicle liability policy" is explicitly limited to the term *"as ... used in this chapter."* A.R.S. § 28–1170(A) (emphasis added). We have, therefore, an instruction from the legislature that counsels against using the SRA's definition of motor vehicle liability policy for the purposes of other acts such as the UMA.[7] Moreover, a companion provision to the UMA explicitly provides that the definitions of insurance policies are *not* mutually exclusive. A.R.S. § 20–251 reads as follows:

Definitions not mutually exclusive.

It is intended that certain coverages may come within the definitions of two or more kinds of insurance as set forth in

---

**6.** Under the doctrine, statutes on the same subject are to be construed together. We have previously warned against reading these two statutes *in pari materia* because "while both [the SRA] and [the UMA] deal with aspects of Arizona motor vehicle liability policies, the statutes approach the subject from different perspectives." *McKeon*, 159 Ariz. at 114, 765 P.2d at 516. "There being no statutory conflict or ambiguity, application of the *in pari materia* doc-

trine to two statutes enacted at different times to deal with different problems, brings more confusion than enlightenment." *Id.* Our warning, though not always heeded, *West American Ins. Co. v. Pirro*, 167 Ariz. 437, 808 P.2d 322 (Ct.App.1990), remains in effect.

**7.** The SRA also explicitly recognizes other automobile liability policies that are not subject to its requirements. *See* A.R.S. § 28–1172.

this article, and the fact that such a coverage is included within one definition shall not exclude such coverage as to any other kind of insurance within the definition of which such coverage likewise reasonably is includable.

Thus we reject St. Paul's contention that it "did not write an automobile liability insurance or motor vehicle liability insurance policy" because "[i]t wrote a comprehensive general liability policy containing" automobile liability insurance. Appellant's Reply Brief at 8 n. 1. A.R.S. § 20–251 clearly forbids such an interpretation.

■ Under the operation of our statutes governing insurance, the type of policy is determined by the type of coverage provided, not by the label affixed by the insurer.[8] Otherwise, it would be a simple matter for insurers to evade the requirements of Arizona law by changing the title of the policy. The statutes are part of every insurance policy and mandate that policies providing specific types of coverage meet specific requirements. *See, e.g., Sandoval v. Chenoweth,* 102 Ariz. 241, 428 P.2d 98 (1967); A.R.S. § 20–1118.

■ Therefore, the fact that AAID's policy with St. Paul is labelled as a comprehensive general liability policy does not mean it is not also an automobile liability policy under the UMA. The question is whether the coverage provided is reasonably includable within the term "automobile liability or motor vehicle liability policy" set forth in A.R.S. § 20–259.01. We believe policy coverage providing "LIABILITY PROTECTION FOR AUTOS" is within the statutory scope of an automobile liability policy no matter what label is printed at the top of the policy.

b. Does the UMA Apply Only to Policies Issued Under the SRA?

The language of the UMA further belies St. Paul's contention that the statute was only intended to apply to motor vehicle

liability policies issued pursuant to the SRA. The UMA explicitly refers to "automobile liability *or* motor vehicle liability policies." A.R.S. § 20–259.01 (emphasis added). Both common sense and the rules of statutory construction forbid equating the terms "automobile liability" and "motor vehicle liability" policies because "[e]ach word, phrase, clause, and sentence must be given meaning so that no part will be void, inert, redundant, or trivial." *City of Phoenix v. Yates,* 69 Ariz. 68, 72, 208 P.2d 1147, 1149 (1949).

Thus, even if we accepted St. Paul's invitation to construe the UMA *in pari materia* with the SRA, we would still have to give independent meaning to the term "automobile liability" policy. The term "automobile liability" policy must mean something different than "motor vehicle liability" policy when both terms are used in the disjunctive in the same sentence of the same statute. If "motor vehicle liability" policies, as St. Paul contends, refer to only those policies issued pursuant to and conforming with the requirements of the SRA, then "automobile liability" policies must refer to those issued under different circumstances.

This conclusion comports with the subject matter, historical background, and spirit and purpose of the UMA. "The purpose of the [UMA] statute is to afford protection to victims of financially irresponsible drivers." *Calvert,* 144 Ariz. at 294, 697 P.2d at 687. "The statute is remedial and should be liberally construed in order to carry out the intent of the Legislature." *Id.*

Thus, [the UMA] allows the driver to protect himself and his passengers— most often his own family and friends— from the loss by injury caused by uninsured drivers to the same extent that he protects others from the risk of his own negligence.

*Spain v. Valley Forge Ins. Co.,* 152 Ariz. 189, 192–93, 731 P.2d 84, 87–88 (1986). The

---

8. For example, liability insurance protects against the risks enumerated in A.R.S. § 20–252, which defines casualty insurance and includes *vehicle insurance.* The term "policy" is also broadly defined as "contract of or agreement

for or effecting insurance, or the certificate thereof, *by whatever name called,* and *includes* all clauses, riders, *endorsements* and papers attached thereto and a part thereof." A.R.S. § 20–1102 (emphasis added).

offer of UIM coverage mandated by A.R.S. § 20–259.01(C) was intended to implement this protection. *See Higgins v. Fireman's Fund Ins. Co.*, 160 Ariz. 20, 22–23, 770 P.2d 324, 326–27 (1989); *see also State Farm Mut. Auto. Ins. Co. v. Wilson*, 162 Ariz. 251, 253–54, 782 P.2d 727, 729–30 (1989) (discussing history and objectives of UIM legislation); *Spain*, 152 Ariz. at 191–94, 731 P.2d at 86–89 (discussing history and purpose of UM legislation).

In the present case, AAID purchased automobile liability insurance to protect itself from the claims of those injured by the negligence of AAID's corporate employees operating automobiles within the scope of their duties. AAID extended this liability protection to its *employees*, as insureds, by special endorsement. It follows that the named insured was entitled to the statutorily required opportunity to purchase UIM coverage to protect itself and its covered employees from underinsured drivers to the same extent that its liability insurance protected others from the negligence of its employees. *Spain*, 152 Ariz. at 192–93, 731 P.2d at 87–88.

We emphasize the importance the legislature has given to UM and UIM coverage in a state where many if not most drivers are under- or uninsured despite mandatory insurance laws. As we have noted, the UMA was passed in explicit recognition that automobile insurance, while mandatory, is nonetheless unavailable in all too many cases; and where it is available, as in this case, it is often inadequate to fully compensate the injuries incurred. *Wilson*, 162 Ariz. at 253–54, 782 P.2d at 729–30; 2 A. WIDISS, UNINSURED & UNDERINSURED MOTORIST INSURANCE § 35.2, at 47 (comment) (2d ed. 1990). Professor Couch also points out that "the liberal purpose behind the UM statutes ... serve[s] as rationale for creating whatever fund is necessary to compensate the innocent injured party." 12A COUCH ON INSURANCE § 45.628, at 83 (2d ed. 1981). Arizona courts have expressly recognized and endorsed these principles for nearly thirty years. *Sandoval*, 102 Ariz. 241, 428 P.2d 98; *Carpenter v. Superior Court*, 101 Ariz. 565, 422 P.2d 129 (1966); *Jenkins v. Mayflower Ins. Exch.*, 93 Ariz. 287, 380 P.2d 145 (1963); *Geyer v. Reserve Ins. Co.*, 8 Ariz.App. 464, 467, 447 P.2d 556, 559 (1968). In that time, the legislature has never indicated that these principles should not inform our interpretations of the SRA or UMA.

■ Given this background, we believe it would be inconsistent with the purposes of the UMA to restrict the words of the statute requiring offer of UIM coverage to only those motor vehicle liability policies mandated by the SRA. We therefore reject St. Paul's claim that UIM coverage *must* be offered *only* to those who are already required to purchase automobile liability insurance that must conform to the SRA.[9] We addressed the relationship be-

---

9. The final step in St. Paul's argument is that its policy with AAID does not conform to the requirements of the SRA because it fails to state that it was issued subject to the provisions of the SRA and was not certified pursuant to A.R.S. § 28–1170(A). Appellant's Opening Brief at 11–12. Almost thirty years ago we rejected the argument that a policy has to be certified to fall under the SRA. *Jenkins*, 93 Ariz. at 290–91, 380 P.2d at 147–48.

Under *Jenkins*, the SRA applies to all policies issued in Arizona, whether they provide coverage for owned automobiles or non-owned (operated) automobiles. *See* A.R.S. § 28–1170(A). Given Gilmore's apparent concession that the policy as issued did not meet the "very specific requirements" of the SRA (Petition for Review at 7), and our disposition of the case on other grounds, we have not rejected St. Paul's basic premise that the policy in question was not issued under the SRA.

We note, however, that the SRA covers both owners' *and* operators' policies. The latter "insure the person named as insured in the policy [AAID and its employees] against loss from the liability imposed on [them] by law for damages arising out of the use ... of any motor vehicle not owned by [it]...." A.R.S. § 28–1170(C). We note also that the SRA specifically exempts an operator's policy purchased by an employer *to protect itself from liability for an employee's* use of vehicles not owned by the employer. The SRA "shall not be held to apply to ... policies insuring solely the insured named in the policy against liability resulting from the maintenance or use by persons in the insured's employ ... of motor vehicles not owned by the insured." A.R.S. § 28–1172(B).

It appears, therefore, that AAID's policy as issued was within the exemption of § 28–1172(B). With the endorsement adding AAID's employees as insureds under the non-

tween the SRA and the UMA in *Calvert,* where we stated:

> The legislature intended the [SRA] to protect the general public against the individual, financially irresponsible motorist. On the other hand, the [UMA] compels the carriers to provide economic *protection for the insured individual* against the financially irresponsible segment of the driving public. The former is for the public in general and the latter for the individuals who have the foresight to protect themselves against the public.

*Calvert,* 144 Ariz. at 296, 697 P.2d at 689 (emphasis in original) (citation omitted). We believe the UMA's application to automobile liability policies means that those who purchase non-owned automobile liability insurance must be given the opportunity to exercise foresight by protecting themselves against underinsured motorists.

### CONCLUSION

■ We hold, therefore, that, with the possible exception of umbrella (true excess) policies which we do not consider today,[10] a policy that provides automobile liability insurance is an "automobile liability or motor vehicle liability" policy within the meaning of A.R.S. § 20–259.01(A), (B), and (C). AAID's operator's policy with St. Paul was therefore subject to the requirements of the UMA, and St. Paul was obligated to offer UIM coverage. Its failure to do so, as the parties concede, results in imputation of the coverage to the policy as a matter of law. A.R.S. § 20–1118; *Insurance Co. of N. Am.,* 166 Ariz. at 85, 800 P.2d at 588.

The court of appeals' opinion is vacated and the judgment is affirmed.

GORDON, C.J., and CAMERON, MOELLER and CORCORAN, JJ., concur.

owned automobile liability coverage, however, the policy fell outside the exemption and within the ambit of the SRA.